UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

--------------------------------------------------------
                                          :
Maher Mawaldi, M.D., *et al.*,            :        CASE NO. 4:04-cv-2146
                                          :
              Plaintiffs,                 :
                                          :
vs.                                       :        Memorandum, Opinion, and Order
                                          :        [Resolving Doc. No. 28]
St. Elizabeth Health Center, *et al.*,    :
                                          :
              Defendants.                 :
                                          :
--------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Defendants St. Elizabeth Health Center, Humility of Mary Health Partners, Inc., Nadine C. Bruce, M.D., and Steven D. Robbins, M.D. ("Defendants") move for summary judgment [Doc. 28]. The Plaintiffs Maher Mawaldi, M.D., and Salwa Agemy oppose the motion [Doc. 38].[1/]  The Court finds that Plaintiffs fail to show material issues of fact to support their claims for hostile work environment, discrimination on the basis of national origin and religion, defamation, negligent and intentional infliction of emotional distress, tortious interference with contract, and loss of consortium.  The Court thus GRANTS the Defendants' motion.

I. Background Facts

Plaintiff Maher Mawaldi, M.D., is a Syrian-born Muslim.  At some point after graduating from

---

[1/]The Court notes that after the Defendants filed a motion for summary judgment but before Plaintiffs had filed their response, Plaintiff's counsel sought to withdraw his representation, citing differences in strategy between himself and Plaintiff.  Plaintiff filed his summary judgment response pro se and continues to proceed in this litigation pro se.

-1-

Case No. 4:04-cv-2146
Gwin, J.

medical school in Syria, he immigrated to the United States, and worked in a research position at Indiana

University School of Medicine.  On March 21, 2002, Mawaldi was appointed to be a first-year resident

in Internal Medicine at St. Elizabeth Health Center, in Youngstown, Ohio, for the year beginning July 1,

2002, and ending June 30, 2003.  St. Elizabeth runs an Internal Medicine Residency Program accredited

by the American Council of Graduate Medical Education.  Mawaldi was chosen for one out of only eight

open slots in the first-year, or PGY-I,[2] class.  Of the 24 residents in the internal medicine program at the

beginning of the 2002-2003 year, all were international medical graduates.  Six residents were from the

Middle East and 16 were from India or Asia.  Only one resident was from the United States.

An Internal Medicine residency is a three-year program.  Residents participate in clinical rotations,

each lasting one month.  Residents are supervised by faculty members and senior residents.  At the end of

each rotation, every supervising faculty member and resident prepares a written evaluation of the supervised

resident.  The written evaluation consists of both numerical rating and narrative comment.  Each resident's

progress is tracked by the Residency Evaluation Review Committee ("RERC"), which is made up of

several faculty members and a chief resident.[3] Defendant Bruce, Program Director, chaired the committee.

During the first quarter of 2003, Associate Director Thomas Marnejon chaired RERC while Bruce was

on medical leave.

Defendants have produced evidence, which Plaintiff does not seriously dispute, that in the first few

months of his residency, Mawaldi was behind his peers in terms of basic medical knowledge and cognitive

---

[2] "PGY" standards for "Post Graduate Year."

[3] The faculty members on RERC during July 2002-July 2003 included Dr. Nadine Bruce, Dr. Thomas Marnejon, and Dr. Charles Wilkins, as well as other faculty.  The chief resident was Dr. Abdul-Razzak Alamir.

Case No. 4:04-cv-2146
Gwin, J.

skills.  *See, e.g.,* Def. Exh. 8, Marnejon Aff. (recounting September 2002 rotation); Pl. Exh. U, RERC

Minutes.  While early on he received "satisfactory" ratings of 4 and 5 (out of 10), and was deemed to be

improving, *see* Pl. Exh. U, RERC Minutes, faculty comments as the year progressed displayed concern

about his performance.  *See, e.g.,* Def. Exh. 9, Cropp Aff. (stating, in November evaluation, "[Mawaldi]

[d]oesn't know patients well enough. No improvement from 1st rotation. I'm disappointed in his

performance this month."); Def. Exh. 10, Mawaldi Depo. 84 (quoting Robbins's December 2002

evaluation: "[Mawaldi] is not on pace to be able to supervise PGY I residents by July 2003. He appears

to be struggling most with his knowledge base and his communication skills."); Def. Exh. 8, Marnejon Aff.

(describing meeting with Mawaldi in January 2003, during which Mawaldi acknowledged his clinical

deficiencies).

Plaintiff, for his part, has also produced evidence of peer evaluations tending to show both positive

and negative aspects of his performance.  Pl. Exh. C, SP and Rater Comments.[4]  The Court notes,

however, that Mawaldi has not indicated what position these evaluators held.  They appear to be neither

internal medicine residents nor faculty members.

In January 2003, after reviewing his evaluations, RERC by consensus placed Mawaldi on academic

warning.  Dr. Marnejon, acting director, informed Mawaldi that the committee felt his clinical and cognitive

performance were below the expected level at that point of the residency. Def. Exh. 8, Marnejon Aff.

Mawaldi's evaluations throughout the spring of 2003 continued to reflect faculty concern over his

---

[4]As an example, one set of comments stated: "Left out a few gaps in the History. Overall did a quite comprehensive interview. Excellent job."  The very same evaluator also appears to have written, for the same exercise: "During the physical exam Dr. Mawaldi seemed to be just 'going through the motions' of the physical rather than actually learning from it.  For example, when he did the arm strength test he said 'Wonderful!' before I even had a chance to demonstrate whether I had arm strength or not."  Pl. Exh. C., SP and Rater comments.

Case No. 4:04-cv-2146
Gwin, J.

performance, even though some also showed progress.[5]  Some evaluations numerically rated him at the satisfactory level, others at the unsatisfactory level.  *See* Def. Exh. 9, Cropp Aff. (in February 2003 evaluation, rating performance unsatisfactory and stating, "Dr. Mawaldi is very nice and pleasant to be around.  He tries very hard.  Unfortunately, he doesn't 'connect the dots' very well.  He is either intimidated or cannot apply yesterday's concepts to today's problem."); Pl. Exh. G, Wilkins June 2003 Evaluation (rating performance satisfactory, and stating, "I feel Dr. Mawaldi may be making some progress.  He sometimes forgets important details at times such as giving NSAIDs to elderly with renal or heart disease.  He needs to pay more attention to details and be given more coaching to deem whether he will be "safe" as a PGY2.").[6]

On June 5, 2003, RERC placed Mawaldi on academic probation for a period of four months and prescribed a plan for remediation.  On June 6, 2003, Defendants Bruce and Robbins met with Mawaldi to discuss the plan. The Memorandum for the Record, dated June 6, 2003, and signed by Defendants Bruce and Robbins, as well as by Mawaldi, explained the reasons for the action:

> 1. [Mawaldi] cannot adequately apply his medical knowledge to clinical situations.
> 2. There are communication problems; he does not always follow the advi[c]e of his supervising residents and faculty attending physicians.
> 3. He is not yet ready to supervise PGY-1 residents.
> 4. The faculty have grave concerns that he will not be able to perform independently in emergent clinical situations.

---

[5]In his brief, Mawaldi has also cited to additional evaluations and RERC minutes that he has failed to put into evidence, either through an affidavit or the documents themselves.  *See* Pl. Br. 4 (citing April 17, 2003 and May 1, 2003 notes).

[6]The Court notes that Mawaldi's own version of this evaluation leaves out important aspects of Dr. Wilkins's comments.  Mawaldi, taking Wilkins's comments out of context, described the evaluation as stating that "he will be 'safe' as a PGY-2."  Pl. Br. 5.

Case No. 4:04-cv-2146
Gwin, J.

Def. Exh. 11, Memorandum for the Record, June 6, 2003.

The remediation plan, signed by Defendant Bruce and Mawaldi, proposed to (a) place Mawaldi into highly supervised rotations with faculty members chosen for their educational expertise; (b) place PGY-3 residents on call with Mawaldi specifically to monitor him; (c) assign Chief Medical Resident Abdul-Razzak Alamir to monitor Mawaldi on general medicine and to conduct ongoing educational sessions to concentrate on:

> a.  Improving his logical thinking appropriately applying his medical knowledge;
> b.  Writing meaningful and correct patient orders;
> c.  Orally presenting patient cases in a meaningful way; and
> d.  Understanding the importance of asking for help.

Def. Exh. 12, "Remediation Plan for Maher Mawaldi July-October 2003," June 20, 2003.  According to the June 6, 2003 memo, Mawaldi was also informed that the possible consequences of unsatisfactory performance by the end of the remedial period included possible dismissal from the program. Def. Exh. 11, Memo for the Record, June 6, 2003.

Pursuant to the remediation plan, Mawaldi spent July, August, and September on subspecialty rotations, and PGY-3 residents took call with him.  Plaintiff has produced evidence that his performance improved during this time.  Comments by supervising physicians indicate the level of remediation still required:

> I believe Dr. Mawaldi's medical school training did not provide him with an adequate foundation of basic pathophyisiology.  A good analogy would be someone building an elaborate home on a foundation that has missing concrete blocks.
> . . .
> After being supplied with some basic cardiac pathophysiologic principles, we began to make some progress toward applying the information to clinical situations.  However, the duration of this rotation was too short to carry this endeavor to significant fruition. To his credit, Dr. Mawaldi worked hard during the course of this one-month rotation to correct

-5-

Case No. 4:04-cv-2146
Gwin, J.

> his deficit and make forward progress.
>
> . . .
>
> Considerable effort on his part will be required to reach a knowledge level commensurate with his peers. . . . I believe his clinical career can be salvaged, if he can acquire a much stronger foundation in basic pathophysiology.  *Literally, he needs an educational experience like the Principles of Medical Science Course given to the M-2 students at NEOUCOM.*

Pl. Exh. J, Comments by Dr. J.Ronald Mikolich, Sept. 8, 2003, regarding 7/1/03-7/30/03 rotation. (Emphasis added).

Mawaldi did not complete his September rotation.  In a letter dated September 1, 2003, Mawaldi gave notice of his resignation from St. Elizabeth, effective September 26, 2003.[7/]  In the letter, Mawaldi cited "family issues" as his reason for leaving.  In his deposition, however, he retracted the statement, admitting that he did not resign for "family issues."  Def. Exh. 10, Mawaldi Depo. 132.

In order to obtain a position in a residency program elsewhere, Mawaldi sought reference letters from Defendant Bruce, as well as others who had supervised him on various rotations – Dr. Wilkins, Dr. Youssef, and Dr. Kim.  Bruce's letter, dated September 16, 2003, described the difficulties Mawaldi had had during his first year, including the fact that he had been put on probation.  Among the four major problems she observed in Mawaldi's performance, Bruce wrote:

> He thinks he knows what he is doing and is unaware that his judgment is faulty.  This makes him dangerous as an independent practitioner.  His supervising residents had to

---

[7/]The Court notes that Mawaldi may have contemplated resigning before the beginning of September.  Plaintiff has provided a generic reference letter, written by Defendant Bruce, dated June 17, 2003.  The letter states:

> Dr. Maher Mawaldi has requested this letter of reference for a PGY-2 internal medicine residency position in 2003. . . . He will have a PGY-2 contract with us beginning July 1, but I have told him I would release him from [the] contract if he found another program. . . .

Pl. Exh. H, Bruce reference letter, June 17, 2003.  In addition, Mawaldi admitted in his own brief that during the probation period, he attended some interviews and attempted to seek residency training elsewhere.  *See* Pl. Br. 6.

Case No. 4:04-cv-2146
Gwin, J.

monitor him closely.

Def. Exh. 15, Bruce Letter to Fleckman, Sept. 16, 2003.   In a later letter, Bruce replaced the word

"dangerous" with "unable to function."  *See* Def. Exh. 17, Bruce Letter to Cash, Mar. 17, 2004 ("This

makes him unable to function as an independent practitioner.").[8]   Toward the end of her reference letter,

Bruce wrote:

> On a positive note, Dr. Mawaldi has an excellent attitude and strives to do well.  He is
> open to constructive criticism.  His interpersonal skills are good.  He is a likable gentleman
> who relates well on a social level with everyone and is a caring physician.  His ethics have
> never been questioned.
>
> I believe that in a different specialty with a fresh start Dr. Mawaldi may progress in a
> satisfactory manner.

Def. Exh. 15, Bruce Reference Letter, Sept. 16, 2003; Def. Exh. 17, Bruce Reference Letter, Mar. 17,

2004.

---

[8] The four problems Bruce listed were:

1. He cannot apply the medical knowledge he has to the clinical situation.
His knowledge base appears average and continues to improve, but he did not advance in his abilities to make clinical decisions.

2. He does not know when to call for help in clinical situations.
He thinks he knows what he is doing and is unaware that his judgment is faulty.  This makes him dangerous as an independent practitioner.  His supervising residents had to monitor him closely.

3. He does not hear what he is told.
Some fa[c]ulty members question whether this is a language barrier.  When speaking to him, I believe that he understands English well enough. (He is married to an American woman and speaks English at home on a regular basis.)  He does not, however, appear to process what he hears.  He needs to be asked to verbalize instructions that he has been given.

4. He does not appear to understand that his abilities [are] below par.
I have strongly advised Dr. Mawaldi to seek residency training in a less broad specialty where the integration of knowledge might be easier.

Def. Exh. 15, Bruce Reference Letter, Sept. 16, 2003; *see also* Def. Exh. 16, Bruce Ref., Mar. 17, 2004.

Case No. 4:04-cv-2146
Gwin, J.

The other letters of reference were less pointed about Mawaldi's weaknesses.  Dr. Wilkins, who

wrote his letter while supervising Mawaldi on his last rotation, wrote:

> During the early part of his residency he was made aware of a communication problem and
> this has been improving.  I recently witnessed him interacting with a 98-year-old patient
> and is doing very well.  His knowledge in medicine was weak at the beginning, but again,
> he is reading and improving over time.
>
> He occasionally has problems with high complex cases and is working very hard to
> overcome this area of weakness.

Pl. Exh. N, Dr. Wilkins reference letter, Sept. 11, 2003.  Dr. Jung Kim's recommendation referred very

little to Mawaldi's abilities, but stated:

> Initially, he required putting an extra effort to acclimate to U.S. hospital system, and
> showed a steady improvement on academic as well as clinical performance.  In my
> observation, his medical knowledge is average and continously improving.

Pl. Exh. N, Dr. Kim reference letter, Sept. 11, 2003.

Finally, the letter from Dr. Sayed Yossef mentioned no weakness at all:

> During my rotation, he expressed a great desire to pursue a career in gastroenterology field
> and I found his fund of knowledge to be exemplary, as well as, a great representation to
> his medical school in general.

Pl. Exh. N., Dr. Yossef reference letter, Sept. 17, 2003.

Plaintiff was unable to gain admission to any residency program.  On April 15, 2004, Mawaldi filed

an EEOC complaint.  The EEOC found no violation.  On October 25, 2004, Mawaldi filed the instant

action.

## II. Legal Standard

Summary judgment is appropriate when the evidence submitted shows "that there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

Case No. 4:04-cv-2146
Gwin, J.

R. Civ. P. 56(c).  In seeking summary judgment, the moving party has the initial burden of showing the

absence of a genuine issue of material fact as to an essential element of the nonmoving party's case.  *Waters*

*v. City of Morristown*, 242 F.3d 353, 358 (6th Cir. 2001).  A fact is material if its resolution will affect

the outcome of the lawsuit.  *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998) (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).   In deciding whether the moving party

has met this burden, a court must view the facts and all inferences drawn from them in the light most

favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

However, "a complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party satisfies this burden, the burden shifts to the nonmoving party to set forth

specific facts showing a triable issue.  *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  It is not sufficient for the nonmoving party merely to show that there is some existence of doubt

as to the material facts.  *See id.*

A factual dispute precludes summary judgment only if it is material, that is, if it relates to a matter

essential to adjudication.  The dispute must concern facts that, under the substantive law governing the

issue, might affect the outcome of the suit.  *Anderson*, 477 U.S. at 248.  The factual dispute also must be

genuine.  The facts must be such that if proven at trial a reasonable jury could return a verdict for the

nonmoving party.  *Id.*  "The disputed issue does not have to be resolved conclusively in favor of the

nonmoving party, but that party is required to present significant probative evidence that makes it necessary

to resolve the parties' differing versions of the dispute at trial."  *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987) (citing *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253,

-9-

Case No. 4:04-cv-2146
Gwin, J.

288-89 (1968)); *see also Celotex*, 477 U.S. at 322.

### III. Analysis/Discussion

Plaintiffs Mawaldi and Agemy bring claims for (1) hostile work environment and disparate treatment on the basis of national origin and religion, as prohibited by Title VII; (2) defamation; (3) negligent and intentional infliction of emotional distress; (4) tortious interference with contract; (5) loss of consortium. The Court reviews each of the Plaintiffs' claims in turn.

### A. Title VII Discrimination

The Court first addresses Plaintiffs' claims against Dr. Bruce and Dr. Robbins in their individual capacities.  In the Sixth Circuit, no Title VII claim can be made against an employee in her individual capacity. *Wathen v. General Electric Co.*, 115 F.3d 400, 405 (6th Cir. 1997).  Defendant Bruce is employed by St. Elizabeth as Program Director.  Dr. Robbins is the Associate Program Director.  Neither employed the Plaintiff.  The Court therefore dismisses the Title VII claims brought against Defendants Bruce and Robbins in their individual capacities.  The Court next assesses whether Plaintiffs' claims have merit against the remaining Defendants, St. Elizabeth Health Center and Humility of Mary Health Partners.

### 1. Hostile Work Environment

Plaintiff Mawaldi alleges that he suffered a hostile work environment based on his national origin and religion.  In order to make out a claim for hostile work environment, Mawaldi must show that (1) he was a member of a protected class; (2) he was subjected to unwelcomed harassment; (3) the harassment was because of national origin or religion; (4) the harassment had the effect of unreasonably interfering with his work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer was liable for the harassment. *See Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

Case No. 4:04-cv-2146
Gwin, J.

A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive and that the victim must subjectively regard as abusive. *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000).

In determining whether a hostile work environment existed, this Court must look to the totality of the circumstances. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998). "Appropriate factors for the court to consider when determining whether conduct is severe or pervasive enough to constitute a hostile work environment 'include frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Bowman*, 220 F.3d at 463 (quoting *Harris*, 510 U.S. at 23). The Supreme Court has held that 'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.

In this case, Mawaldi points to Defendant Robbins's practice of holding Bible classes at his house, as well as a comment made by Robbins, as conduct allegedly creating a hostile work environment. Mawaldi claims that Robbins favored students who attended his Bible classes, and he testified that an announcement was made about the classes at orientation. Other than this, he supplies no admissible evidence of comments or instances related specifically to the Bible classes. In his deposition, Mawaldi focused instead on a single comment Robbins made during a one-month rotation supervising Mawaldi.

-11-

Case No. 4:04-cv-2146
Gwin, J.

Mawaldi testified that, at the end of December 2002, Defendant Robbins asked him, "Why don't you celebrate Christmas?" and "Where's my Christmas gift?"

Defendant Robbins's comments about Christmas, and his practice of holding Bible classes at his own home, do not suffice to create a genuine issue of material fact that Mawaldi suffered a hostile work environment.  Even if the statements could be taken as anything more than "simple teasing" or joking (and Mawaldi stated during his deposition that Robbins "always joked . . . [t]hat was his personality," *see* Def. Exh. 10, Mawaldi Dep. at 30),  the conduct was neither frequent nor severe.  Nor does Mawaldi present any evidence or even claim that the comment unreasonably interfered with his work performance.  It is worth noting that Robbins only supervised Mawaldi on two 30-day rotations the whole year, the first one five months after Mawaldi began his residency.  Similarly, Mawaldi presents no evidence whatsoever to suggest that Robbins or anyone else ever discussed the home Bible classes with Mawaldi or within his earshot.[9/]  Countering Mawaldi's claim of hostile environment is undisputed evidence that another Syrian Muslim, Chief Resident Abdul-Razzak Alamir, openly practiced Islam while at St. Elizabeth and never felt any harassment due to his religion.  *See* Def. Exh. 13, Alamir Aff. 1-2.

Because Mawaldi cannot show that Defendant Robbins's comments regarding Christmas reached the level of "severe or pervasive" conduct, his claim for hostile work environment fails.

### 2. Disparate Treatment

#### a. National Origin

Title VII prohibits discrimination on the basis of national origin.  42 U.S.C. § 2000e-2(a).

---

[9/]Allegations stated in Plaintiff's brief do not suffice, as they are not supported by affidavit or other testimony.

Case No. 4:04-cv-2146
Gwin, J.

"National origin" pertains to the geographic birthplace of the person (or his or her ancestors), in Plaintiff Mawaldi's case, Syria. Where a plaintiff relies on circumstantial evidence, his claim of disparate treatment on the basis of national origin follows the familiar *McDonnell-Douglas* burden-shifting formulation. First, the plaintiff must make out a prima facie case. If the plaintiff successfully makes out a prima facie case, the burden shifts to the employer to put forth a legitimate, nondiscriminatory reason for the employment decision. *Gribcheck v. Runyon*, 245 F.3d 547, 551 (6th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Thereafter, in order to prevail on the claim, the plaintiff must show that the employer's stated reason was pretextual. *Id.* at 552.

In order to make out a prima facie case, the plaintiff must establish four elements: (1) he is a member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the position; (4) he was replaced by someone outside the protected class or was treated differently from similarly-situated, non-protected employees. *Dicarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004).

Mawaldi has failed to point to a single non-protected, similarly situated person who was treated differently than he was.[10] Moreover, Mawaldi has failed to point to any adverse employment action. An adverse employment action is something more than a threat of discharge. *See Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999). It is a "'materially adverse change in the terms or conditions of . . . employment because of [the] employer's conduct.'" *Broska v. Henderson*, 70 Fed. Appx. 262, 266-67 (6th Cir. 2003) (quoting *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002)).

---

[10] Indeed, St. Elizabeth employed two other Syrian residents in addition to Mawaldi (although neither was a PGY-I), and both completed the internal medicine program. As mentioned, one of them, Dr. Abdul Alamir, was appointed Chief Resident, a position available only to highly-qualified residents.

Case No. 4:04-cv-2146
Gwin, J.

Constructive discharge occurs when an employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced to quit. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001).  Factors to consider in determining constructive discharge include demotion; reduction in salary; reduction in job responsibilities; reassignment to menial work; reassignment to work under a younger supervisor; badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; offers of early retirement or continued employment on terms less favorable than the employee's former status.  *Id.*

In this case, Mawaldi himself resigned from St. Elizabeth's residency program.  Mawaldi has not, however, provided any evidence that his working conditions were so intolerable that he was forced into resignation.  Indeed, Plaintiff's own exhibit suggests that the process of remediation immediately prior to his resignation was a rewarding one.  *See* Pl. Exh. J, Mikolich comments ("Dr. Mawaldi had a positive experience with me during this month, because we focused on supplying him with the pathophysiologic understanding necessary to care for his patients, on a daily basis.")  Mawaldi has produced insufficient evidence to create an issue of fact that the employer assigned him to menial work, or subjected him to humiliation or badgering aimed at making him resign, or otherwise made working conditions intolerable.  Thus, Mawaldi has failed to make out a claim for constructive discharge.

Although he was not discharged, Mawaldi *was* put on academic probation and remediation.  When he was placed on probation, he was informed of a number of possible consequences, including dismissal, he might face should he fail to improve to an adequate level of performance.  During the period of remediation, he was closely monitored by faculty members and senior residents.  Neither the academic probation nor remediation, however, constitute the type of material change in employment contemplated

-14-

Case No. 4:04-cv-2146
Gwin, J.

by Title VII.  *See Ford v. GMC*, 305 F.3d 545, 553 (6th Cir. 2002) (internal quotation marks omitted) (finding no adverse employment action in a retaliation claim because the employer forced her to work harder and scrutinized her work more closely); *see also Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 789 (6th Cir. 2000) (a poor performance evaluation alone is not the basis of a Title VII claim); *Broska*, 70 Fed. Appx. at 267 (holding that a warning letter and singling an employee out for criticism did not constitute adverse employment action).  Indeed, the remediation period appears to have been aimed at strengthening Mawaldi's skills.  Without more, Mawaldi's probation and remediation do not rise to the level of adverse action.

Because Mawaldi has failed to establish key elements of his prima facie case, his claim on the basis of national origin fails.

Even if Mawaldi could establish a prima facie case, his claim would fail because the Defendants have come forward with more than ample evidence of a legitimate, nondiscriminatory reason for any employment decision – Mawaldi's clinical performance and wanting qualification.  Mawaldi has produced no evidence to raise an issue of fact that his performance was not a legitimate basis for any employment action.  His own exhibits show that, while his performance was improving, he still had a great deal of knowledge to acquire before he would be prepared to supervise PGY-2 residents.  *See, e.g.,* Pl. Exh. J, Comments by Dr. J.Ronald Mikolich, Sept. 8, 2003, regarding 7/1/03-7/30/03 rotation ("Considerable effort on his part will be required to reach a knowledge level commensurate with his peers. . . . I believe his clinical career can be salvaged, if he can acquire a much stronger foundation in basic pathophysiology. *Literally, he needs an educational experience like the Principles of Medical Science Course given to the M-2 students at NEOUCOM.*") (emphasis added).

-15-

Case No. 4:04-cv-2146
Gwin, J.

### b. Religion

Mawaldi also contends that Defendants treated him differentially on the basis of religion. In particular, Mawaldi has suggested that those who attended Bible classes were treated better than he was treated. To make out a prima facie case of discrimination based upon religion, a plaintiff must show: (1) he has a bona fide religious belief that conflicts with an employment requirement; (2) he informed his employer of the conflict; (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. *Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir. 1987).

Mawaldi has produced no evidence to suggest that attending Bible classes was an employment requirement. In his deposition, he admitted that the classes were held at Defendant Robbins's home and not at St. Elizabeth, that they were not part of the curriculum and were not considered a rotation. Def. Exh. 10, Mawaldi Depo. 44-45. He offered no evidence to rebut Defendant's claim that the Bible classes were not part of the residency training. That Bruce may have announced, at orientation, that Defendant Robbins held Bible classes at his home does not amount to an employment requirement. Moreover, Mawaldi admits that he never informed St. Elizabeth of any feelings of discomfort, let alone any conflict he felt between an employment requirement and his existing beliefs. Def. Exh. 10, Mawaldi Depo. 100-101. Mawaldi thus fails to meet the prima facie elements listed above.

Even following the familiar burden-shifting framework of *McDonnell Douglas*, Plaintiff's claim would lose. Plaintiff claims that a Syrian Christian, a PGY-2, was promoted to PGY-3, despite having similar difficulties as Plaintiff. *See, e.g.*, Pl. Exh. U, RERC Minutes (noting improvements resident had made in clinical judgment and in asking for faculty assistance). Plaintiff has not presented any evidence to create an issue of fact that the Christian resident was indeed comparable to Plaintiff in terms of performance

-16-

Case No. 4:04-cv-2146
Gwin, J.

evaluations.  Moreover, as mentioned in the discussion of national origin above, Plaintiff fails to show an adverse employment action.

Because Mawaldi has failed to make out a prima facie case that he was discriminated against on the basis of religion, his Title VII claim on this basis fails.

### C. Supplemental State Claims

In addition to his federal claims, Plaintiff Mawaldi has raised state claims for defamation, negligent and intentional infliction of emotional distress, and tortious interference with contract.  Mawaldi's wife, Plaintiff Selwa Agemy, also alleges loss of consortium.

### A. Defamation

Defamation is a "false publication that injures a person's reputation, exposes him to public hatred, contempt, ridicule, shame or disgrace, or affects him adversely in his trade or business."  *Sweitzer v. Outlet Communs., Inc.*, 726 N.E.2d 1084 (Ohio Ct. App. 1999).  Under Ohio law, the elements needed to make out a defamation claim are: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. *Fitzgerald v. Roadway Express, Inc.*, 262 F. Supp. 2d 849 (N.D. Ohio 2003) (citing *Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Servs., Inc.*, 611 N.E.2d 955 (Oh 1992)).  Written defamation is known as libel; spoken defamation is known as slander.  *Rest. of Law 2d, Torts* (1977) 177, § 568.  Written matter is libelous *per se* if it is defamatory on its face.  Words imputing the general want of professional skill or knowledge of a physician are actionable *per se*.  *Mauk v. Brundage*, 67 N.E. 152 (1903).

-17-

Case No. 4:04-cv-2146
Gwin, J.

Mawaldi complains that Defendant Bruce published the following allegedly false statements.  First, in a September 16, 2003, letter of reference, Dr. Bruce described Plaintiff as "dangerous an independent practitioner."  Def. Exh. 15.  Second, in a March 17, 2004, letter of reference using modified language, Bruce described Plaintiff as "unable to function as an independent practitioner."  Def. Exh. 17.  At Mawaldi's request, Bruce sent these letters to program directors at various programs where Mawaldi sought a position as a PGY-2.  She had earlier used the same language in letters to supervisors in his final three rotations during remediation.  *See* Pl. Exh. I, Bruce Letters to Mikolich, Cutrona, and Wilkins, June 17, 2003, and Aug. 26, 2003.  Finally, Mawaldi refers to a statement Bruce made in an email to residents scheduled to supervise Mawaldi, which stated that Mawaldi made "transcription mistakes."  Pl. Exh. M, Bruce email to residents, July 31, 2003.

There is no question that these statements impugned Mawaldi's competence.  Mawaldi also shows evidence to raise an issue of fact that the statements in the reference letters prevented him from gaining admission to any residency program.

Defendants, however, raise the defense of qualified privilege.  Ohio law provides a defense of qualified privilege to allegations of defamation "where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Knox v. Neaton Auto Prods. Mfg.*, 375 F.3d 451, 460 (6th Cir. 2004) (citing *Hahn v. Kotten*, 43 Ohio St. 2d 237, 243 (1975)).  As the Ohio Supreme Court has stated, a publication is privileged when it is

> fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned. . . . The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties

-18-

Case No. 4:04-cv-2146
Gwin, J.

> only.  The privilege arises from the necessity of full and unrestricted communication
> concerning a matter in which the parties have an interest or duty, and is not restricted within
> any narrow limits.

*A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d

1283, 1290 (Oh. 1995) (citations omitted).

A plaintiff can only defeat a defendant's qualified privilege with a clear and convincing showing that

the communication was made with actual malice.  In a qualified privilege case, "'actual malice' is defined

as acting with knowledge that the statements were false or acting with reckless disregard as to their truth

or falsity." *Id.* at 1292.

In this case, Bruce's reference letters to prospective employers as well as communication to

supervising residents and faculty members was privileged.  Bruce's communication to employers was

limited to letters of reference that Mawaldi himself requested.  Her communication with other senior

residents and faculty members was in preparation of their supervision of Mawaldi.  Thus, Bruce published

her comments in a proper manner and to proper parties, on a proper occasion.

Further, since Mawaldi was applying for positions where he would be supervising residents and

diagnosing and administering care to patients, Bruce's interest in ensuring quality health care warranted her

communication to the employers.  *See A & B A-Bell,* 651 N.E.2d at 1290-92 (discussing importance of

public interest).  Indeed, the evidence shows that as Program Director, Bruce had not only an interest but

also a duty to disclose an applicant's clinical deficiencies.  *See* Def. Exh. 5, Bruce Aff.; *see also McKenna*

*v. Mansfield Leland Hotel Co.*, 9 N.E.2d 166 (5th Dist. Richland Cty 1936) (where publication occurs

in a letter of reference between employer and prospective employer, qualified privilege applies if made in

good faith by a person having a duty in the premises to one who has a definite interest therein).

-19-

Case No. 4:04-cv-2146
Gwin, J.

Similarly, since Mawaldi's improvement was critical to his qualification for the second year of residency, Bruce's interest in preparing Mawaldi for the second year (and, by turn, her interest in the public health) also warranted her communicating Mawaldi's deficiencies to his supervising residents and faculty members. *See El-Shiekh v. Northwest Ohio Cardiology Consultants, et al.*, 2000 Ohio App. LEXIS 4143 (6th App. Dist. Sept. 15, 2000) (verbal and written statements to other physicians expressing concern about cardiology fellow's ability to function in his position were privileged as they protected public health); *Boutsicaris v. Akron Gen. Med. Ctr.*, 1997 Ohio App. LEXIS 2041 (9th App. Dist. Summit Cty, May 14, 1997) (statements made to quality assurance committee and other hospital personnel regarding fitness of appellant to perform surgery on his patients protected by qualified privilege).

Finally, Mawaldi can point to no evidence to suggest that Bruce was motivated by "actual malice." In his response to the Defendants' motion for summary judgment, Mawaldi alleges that Bruce "grabbed" Dr. Marnejon's letter of reference from Mawaldi, refusing to allow Mawaldi to read it and stating that "he will forge the document if something bad was written on it" and that she would "change it to match her letter of recommendation." Pl. Opp. At 8. Mawaldi may not, however, rely on such allegations, unsupported by any evidence. Contrary to Mawaldi's allegations, the record before the court suggests that Bruce was at most strongly zealous in her efforts to get Mawaldi to respond to her perception of his weaknesses and to ensure his safe functioning as a second-year resident. Plaintiff's own exhibit evidences Bruce's efforts at improving Mawaldi's performance: In an email to PGY-3 residents who were slated to take call with Mawaldi, Bruce laid out a list of their responsibilities, finally stating: "Most importantly, correct his mistakes with him as they occur so that he learns." Pl. Exh. M, Bruce email, July 31, 2003. On the record before the Court, Mawaldi has failed to raise an issue of fact to suggest Bruce was motivated by actual malice.

-20-

Case No. 4:04-cv-2146
Gwin, J.

Defendants have established the defense of qualified privilege and thus are entitled to judgment as a matter of law on Mawaldi's defamation claim.

### B. Other State Claims[11/]

#### 1. Tortious Interference with Contract

Where a claim such as tortious interference with contract is based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements also apply to the derivative claim. *El-Shiekh v. Northwest Ohio Cardiology Consultants, et al.*, 2000 Ohio App. LEXIS 4143 (6th App. Dist. Sept. 15, 2000) (citations omitted).  Here, Plaintiff's tortious interference claim is based on the statements Bruce made in her letters of reference.  Thus, for the same reasons the Court found a qualified privilege to preclude Plaintiffs' claim of defamation, the Court finds the privilege bars Plaintiffs' claim for tortious interference with contract.

#### 2. Negligent and Intentional Infliction of Emotional Distress

To begin with, Ohio courts do not recognize a claim for negligent infliction of emotional distress in the employment context. *Antalis v. Ohio Dep't of Commerce*, 589 N.E.2d 429 (Ohio Ct. App., Franklin Cty. 1990); *Dunn v. Medina Gen. Hosp.*, 917 F. Supp. 1185 (N.D. Ohio 1996).

In order to make out a claim for *intentional* infliction of emotional distress, a plaintiff must prove four elements:

(1) that the actor either intended to cause emotional distress or knew or should have

---

[11/]Defendants have moved for summary judgment on all state claims, *see* Def. Br. at 1, but, other than defamation, have not discussed these state claims individually.  Their summary judgment brief refers to them in only the vaguest way.  This Court, however, may nonetheless address the merits of these claims, because the Plaintiff had notice that Defendant seeks to dismiss these claims and Plaintiff has not been prejudiced. *Cf. Doyle v. City of Columbus*, 120 Fed. Appx. 560, 2004 U.S. App. LEXIS 25092 (6th Cir. 2004) (unpublished decision).

Case No. 4:04-cv-2146
Gwin, J.

> known that actions taken would result in serious emotional distress to the plaintiff;
>
> (2) that the actor's conduct was extreme and outrageous, that it went beyond all possible bounds of decency and that it can be considered as utterly intolerable in a civilized community;
>
> (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury;
>
> (4) that the mental anguish suffered by plaintiff is serious and of a nature that no reasonable person could be expected to endure it.

*Yeager v. Local Union No. 20*, 453 N.E.2d 666 (1983).

In this case, Plaintiff Mawaldi has failed to put forth evidence that he suffered serious mental anguish and psychic injury. Moreover, Mawaldi has not provided sufficient evidence to create a genuine issue of fact that the Defendants' conduct was "extreme and outrageous." The problems listed in Defendant Bruce's reference letter were generally the same as those Mawaldi was made aware of after his meeting with Bruce and Defendant Robbins in June 2003. *See* Memorandum for the Record, June 6, 2003 (signed by Mawaldi).[12] Taken in context, Bruce's statement that Mawaldi's faulty clinical judgment made him "dangerous as an independent practitioner" cannot be considered "utterly intolerable in a civilized society." That Bruce's letter was somewhat more pointed than other faculty reference letters does not make her comment outrageous. As the program director, she had a particular duty to communicate resident deficiencies to prospective employers.

---

[12] Again, the memo listed the following problems:

"1. [Mawaldi] cannot adequately apply his medical knowledge to clinical situations.
2. There are communication problems; he does not always follow the advi[c]e of his supervising residents and faculty attending physicians.
3. He is not yet ready to supervise PGY-1 residents.
4. The faculty have grave concerns that he will not be able to perform independently in emergent clinical situations."

Case No. 4:04-cv-2146
Gwin, J.

Finally, the Court notes that two pieces of evidence Plaintiff has proffered to undermine the validity of Bruce's reference letters are immaterial. First, Plaintiff has submitted a reference letter he received from Dr. Douglas Rex, professor of medicine at Indiana University, listed as a top specialist. Rex wrote Mawaldi a letter in December 1999 for admission to an internal medicine residency program. The letter states that Mawaldi "has been working with me on clinical research projects and has worked quite steadily. His work has been accurate and consistent." Pl. Exh. Z, Rex Letter, Dec. 7, 1999. While this letter may be probative of Mawaldi's research skills, it says nothing about whether Bruce's statements about Mawaldi's *clinical* judgment were extreme and outrageous.

Second, Mawaldi has submitted an (unnotarized) affidavit from Dr. Ramakrishna Karibani, a professor of family practice medicine at Down State University, New York. The affidavit states that, in the affiant's opinion, Mawaldi "should never have been labeled as a 'dangerous' physician," and that Mawaldi "made significant improvements on numerous occasions during his residency training at St. Elizabeth Health Center." Pl. Exh. X, Karibani Aff. It is not clear how Dr. Karibani, not having observed or supervised Mawaldi, could know whether Mawaldi made improvements or not. Beyond that, however, even if the Court agreed Mawaldi's performance did not warrant Bruce's comment that his judgment made him "dangerous as an independent practitioner," such a finding would not inexorably lead to the conclusion that Bruce's conduct exceeded the bounds of decency for purposes of an intentional infliction of emotional distress claim. Thus, Dr. Karibani's affidavit creates no issue of fact with regard to whether Bruce's statement was extreme and outrageous. Mawaldi's claims of negligent and intentional infliction of emotional distress fail as a matter of law.

3. Loss of Consortium

-23-

Case No. 4:04-cv-2146
Gwin, J.

As none of the primary claims against Defendants are viable, Plaintiff Salwa Agemy's derivative

loss of consortium claim also fails.  *See Messmore v. Monarch Machine Tool, Co.*, 463 N.E.2d 108, 110

(Ohio Ct. App. 1983) ("[A] cause of action based upon a loss of consortium . . . is dependent upon the

existence of a primary cause of action and can be maintained only so long as the primary action

continues.").

In sum, the Mawaldis have not set forth specific facts sufficient to preclude summary judgment in

favor of Defendants.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS the Defendants' motion for summary judgment.

IT IS SO ORDERED.


Dated: August 8, 2005                                    s/          *James S. Gwin*
                                                         JAMES S. GWIN
                                                         UNITED STATES DISTRICT JUDGE